UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| MICKEY GROSMAN, | ) | Case No.  6:05-bk-10450-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | | |
| ABRAHAM BAR-AM, and | ) | |
| NOURIT, LLC, individually and | ) | |
| derivatively on behalf of Bargo, LLC, | ) | Adversary No. 6:05-ap-328 |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| MICKEY GROSMAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

The plaintiff, Abraham Bar-Am, and the debtor, Mickey Grosman, are acquaintances, serving together on the Israeli police force in the 1970's.  Grosman and his family slowly started investing in businesses, first in Israel and later in the United States.  In 1989, the Grosmans moved to Florida.  They opened a bakery operation, both retail and wholesale, and were financially comfortable.  In 2003, the family sold the bakery business for approximately $900,000 and received cash proceeds from the sale of at least $450,000.  From these proceeds, the family paid off their own home mortgage of approximately $200,000 and decided to use the balance, approximately $250,000, to buy homes in Florida to renovate and to sell.

As the family searched for homes to buy, in February 2004, they deposited $250,000 into a new bank account at Credit Suisse in Zurich, Switzerland.  Although the account was titled in

the name of Noga Grosman, the debtor's wife, Mickey Grosman was a signatory on the account. The debtor freely transferred funds out of the Swiss account and treated the monies as his.

In early 2004, Grosman and Bar-Am renewed their friendship. Bar-Am was interested in immigrating to the United States. Grosman was looking for a business partner to share the cost of investing in distressed houses. The former friends agreed to go into business together and eventually formed a company called Bargo, LLC. During all relevant periods, the debtor was the managing member of Bargo and exclusively controlled Bargo's operations and monies. As Bar-Am made two extended visits to the United States, he, through his own company, Nourit, LLC, invested at least $225,000 into Bargo. In turn, Bargo signed sales contracts to purchase homes in the Orlando area.

Unfortunately, the business relationship between Bar-Am and Grosman, which was always ill-defined, eventually soured. Bar-Am returned to Israel. In his absence, Mickey Grosman transferred title to two homes in which Bargo had an interest to either his separate company, Build-In, LLC, or to his son, Shachar Grosman. The debtor also transferred $50,000 from Bargo's bank account to another Grosman family company. Again, without dispute, the debtor transferred all of Bargo's assets, both the homes and the money, into his control. Bargo is now just a shell corporation. Bar-Am received nothing from his investment.

Bar-Am now argues that the debtor, as the sole managing member of Bargo, breached his fiduciary duty and, alternatively, committed a willful and malicious injury to the property of another.[1] Essentially, Bar-Am argues that the debtor stripped Bargo of its assets for his own personal gain and to the detriment of Bargo, Nourit, and Bar-Am. As such, he contends that

---

[1] The plaintiff seeks only a determination of whether any such debt is dischargeable but does not seek a final judgment determining the amount of the debt. The plaintiff has requested to return to state court for the determination and allocation of liability.

Grosman must repay Bargo, initially, and Bar-Am/Nourit, indirectly, the transferred funds, and that this debt is not dischargeable under Sections 523(a)(4) and (6) of the Bankruptcy Code.[2]

In response, Grosman raises an affirmative defense that Bar-Am never actually contributed any of his own monies to Bargo and, therefore, cannot complain about the debtor's actions in stripping Bargo of its assets.  The debtor argues that he loaned Bar-Am $200,000, which Bar-Am then used to invest in Bargo.  Grosman asserts that, when he stripped Bargo of its assets, he was merely acting to repay the loan that Bar-Am owed to him.   Bar-Am vehemently disputes that Grosman ever made this loan.

The Court held a four-day trial to consider the evidence of both parties.  The testimony was emotional, and the parties hold much enmity against the other. The Court has never before heard a case in which the parties presented such a diametrically opposed version of the facts. Credibility and burden of proof is a significant issue, on both sides.  As such, the Court focused on the documentary evidence and the huge inconsistencies in the parties' stories, eventually concluding that, as to Bargo, the debtor never extended a $200,000 cash loan to Bar-Am and did willfully and maliciously convert Bargo's property for his own use without justification.  For the reasons explained below, any debt due by the debtor to Bargo, directly, and to Nourit and Bar-Am, indirectly, is not dischargeable under Section 523(a)(6) of the Bankruptcy Code.

## **Agreed Events**

Both the Grosman family and the Bar-Am family lived in Israel for decades.   The Grosman family is very close.   Mickey, also known as Amikam Ram, controls the family's finances.  He has been married to Noga Grosman for almost 40 years and has four children, including Shachar.  In 1989, the family immigrated to the United States, and all members of the

---

[2]  Unless otherwise provided, any reference to the Bankruptcy Code herein shall refer to Title 11 of the United States Code.

family are now United States citizens.    Mickey and Noga operated both a retail bakery/restaurant for a time and then started a wholesale bakery, Bakeland, Inc.  The hours were long, and the work was very hard.

In 2003, the debtor decided to sell the bakery business.  On January 26, 2004, he received cash proceeds of at least approximately $450,000 from the sale.[3]  (Plaintiff's Ex. No. 82).  The family used approximately $200,000 to pay off the mortgage encumbering their home.  They intended to use the balance of the monies, approximately $250,000, for future investments, primarily the purchase of residential homes in need of renovation.

On February 26, 2004, Noga Grosman opened a bank account with Credit Suisse in Zurich, Switzerland.  She worked with an account representative named Donato Ripa.  The initial deposit was approximately $250,000, transferred from the debtor's joint bank account with Noga (Defendant's Ex. No. 3); however, the monies were funneled through two other family corporations—Grosman Family Limited Partnership and the Grosman Family Limited Management Company.  The account was titled in Noga's name; however, the debtor was a joint signatory on the Swiss account, and he controlled the funds in the account during the time period relevant to this adversary proceeding.  Noga testified that she selected Credit Suisse because they offered a higher interest rate.

Bar-Am and the debtor worked together on the Israeli police force from 1972 to 1976.  They stayed in infrequent contact after 1976, when they both retired from the police force.  The debtor opened a restaurant and began other types of businesses, eventually immigrating to the United States. Bar-Am worked for a company supplying security services, until 1994, when he opened his own security company with his business partner, Afaf Yeheia.

---

[3] Attorney William Glen Roy testified that the gross sales price for Bakeland, Inc. was $890,000.

Although Bar-Am had never previously visited the United States, in early 2004, he contacted the debtor and asked for his advice about immigrating to the United States. Bar-Am stated that he was worried his teenage daughter was soon to be conscripted into the Israeli army and was looking to move his family to a safer area. Given the debtor's recent sale of the bakery and his new interest in investing in real estate, they also discussed going into business together, and Bar-Am made plans to visit the debtor in Florida in March 2004.

Bar-Am arrived on the first of two trips to the United States on March 11, 2004. The first trip was short. On March 24, 2004, Bar-Am returned to Israel to get his affairs in order and with the anticipation of moving to and working in the United States. He returned to the United States on April 23 and this time stayed through July 21, 2004, when he again went home to Israel. Most of the events relevant to this dispute occurred between March 11 and July 21, 2004.

On Bar-Am's initial trip to the United States, one of his first tasks was to visit an immigration attorney, Larry Rifkin, to start the process of obtaining an immigration visa. The lawyer asked for various financial and business documents, many containing Bar-Am's Israeli identification number. Bar-am supplied these documents and also gave the debtor a copy of the immigration packet. (Defendant's Ex. No. 20). On at least one of these documents, Bar-Am's Israeli identification number was transposed. (Defendant's Ex. No. 85).

With the immigration paperwork started, Bar-Am returned to Israel. He testified that he liquidated certain life insurance policies and obtained from them about $70,000. He also testified that he withdrew cash from his personal and business bank accounts maintained with Bank Leumi with the consent of his business partner, Afaf Yeheia. The documents supporting

these payments are ambiguous.[4]  (Plaintiff's Ex. Nos. 1A and 1B). However, without dispute, Bar-Am traveled to Zurich on April 22, 2004, with at least $270,000 in cash in a briefcase.[5]

Simultaneously, Bar-Am and Grosman started working on their joint real estate venture/partnership. To that end, the men formed three companies. Each man formed his own separate company for the purpose of funneling investment monies into a third, jointly owned corporation that they would form together for the purpose of investing in real estate.  On March 31, 2004, Bar-Am formed Nourit, LLC, a Florida corporation named after his wife. (Plaintiff's Ex. Nos. 12 and 13). Grosman formed Build-In, LLC, on the same day. (Plaintiff's Ex. No. 14 and 15).  The same attorney, William Glenn Roy, who previously had represented the debtor, prepared the legal paperwork for each man's individual corporations.  As to Nourit, Bar-Am was and is the sole manager of the company.  He opened a bank account at Wachovia Bank for Nourit on or about April 26, 2004. (Plaintiff's Ex. No. 84). Similarly, the debtor opened a separate account for Build-In at the same Wachovia branch bank.  Although Shachar Grosman acted as the managing member of Build-In for a short period of time,[6] the debtor, as of June 2, 2004 and thereafter, was the sole owner and managing member of Build-In.  (Plaintiff's Ex. Nos. 14, 15, and 19)  Further, even during the period when Shachar was the sole member of Build-In, the debtor controlled the company and made all of the decisions regarding Build-In's investments and actions.

---

[4] Bar-Am testified that he withdrew approximately 290,000 Israeli Shekels from the various accounts, which, equals approximately $70,000 US Dollars.  At least one of the transfers, on page B0191, reflects a transfer that occurred on September 23, 2004, long after the relevant events had concluded.
[5] The debtor certainly disputes that Bar-Am contributed individually more than $70,000 to the monies he brought to Switzerland to deposit at Credit Suisse; however, the parties agree Bar-Am traveled with $270,000 in cash to Zurich.
[6] Shachar Grosman was the sole managing member of Build-In from April 26 through June 2, 2004. (Plaintiff's Ex. No. 15).

After forming Nourit and Build-In, the new business partners, Bar-Am and Grosman, created a third jointly owned corporation, Bargo, LLC, effective as of May 19, 2004.  (Plaintiff's Ex. No. 17).  During the relevant period, the debtor was the sole managing member of Bargo, although his corporation, Build-In, was the managing member from May 19 through June 2, 2004. (Plaintiff's Ex. Nos. 17 and 17A).  Bargo also opened a bank account at Wachovia Bank on May 20, 2004 (Plaintiff's Ex. Nos. 7 and 8).

Both Nourit and Build-In are equal co-owners of Bargo pursuant to an operating agreement signed on June 2, 2004. (Plaintiff's Ex. No. 18, Article 5.1). As relevant here, the terms of the operating agreement give Grosman, the managing member, "overall management and control of the business and affairs" of Bargo with broad powers to act exclusively on behalf of Bargo. (Plaintiff's Ex. No. 18, Article 6.1). Nourit was specifically prohibited from participating in or interfering in any manner with the management of Bargo.  (Plaintiff's Ex. No. 18, Article 6.5).  Nourit and Build-In both contributed capital (Plaintiff's Ex. No. 18, Article 3.1) and shared mutual and equal interests in Bargo's net income and losses (Plaintiff's Ex. No. 18, Article 5.1 and 5.2).

In addition to the capital contributed as specified in the operating agreement, Nourit and Build-In each deposited $125,000 in Bargo's operating account in May 2004 (Plaintiff's Ex. No. 9).  On July 21, 2004, Bar-Am/Nourit later deposited $100,000 into Bargo's bank account, making his total contribution $225,000.  The debtor, acting through Build-In, also on July 21, 2004, deposited an additional amount of $40,000 into Bargo's account, making his total contribution $165,000.

With these monies in the bank, Bargo entered into several contracts to purchase distressed homes in the Orlando area.  Only two of these contracts matured into purchases and

are relevant to this dispute—those involving a home located on Par Street (the "Par Street Property") and another home located on Pointview Circle (the "Pointview Property"). Bargo purchased the Par Street Property for $154,093 on June 1, 2004. (Defendant's Ex. No. 8). The purchase monies came from Bargo's operating bank account at Wachovia. (Plaintiff's Ex. No. 10).

Soon thereafter, the business partners, Bar-Am and the debtor, jointly agreed to refinance the Par Street Property in order to raise capital for Bargo to use in purchasing a second investment home. Initially, Bargo sought a mortgage in its own name, but, due to its recent formation and lack of capital or assets, the bank, Washington Mutual, refused to extend a loan to Bargo. (Plaintiff's Ex. Nos. 22 and 23). Bar-Am then individually applied for a mortgage in his own name. The bank approved this mortgage loan of $100,750. (Plaintiff's Ex. No. 25). On July 14, 2004, the loan closed, and Bar-Am received the net sum of $98,084.74, after paying required fees and costs. (Plaintiff's Ex. Nos. 26 and 28). Bar-Am immediately deposited these funds into the Bargo account. (Plaintiff's Ex. No. 10, Pages No. B0145-B0146). The mortgage still encumbers the Par Street Property. Bargo, acting through its managing member, the debtor, also executed a quit-claim deed temporarily transferring title to the Par Street Property from Bargo to Bar-Am. (Plaintiff's Ex. No. 27). The bank required this transfer as a condition of making the mortgage loan.

After Bar-Am's return to Israel, on July 21, 2004, the debtor, on August 17, 2004, again transferred title to the Par Street Property from Bar-Am's name individually to Build-In. (Plaintiff's Ex. No. 30). The debtor used a power of attorney Bar-Am signed just prior to leaving the United States. (Plaintiff's Ex. Nos. 29 and 86). Build-In still owns the Par Street Property. Bar-Am remains individually liable on the underlying mortgage. The debtor has continued to

make the mortgage payments on the home, which started on September 1, 2004.  Build-In also is receiving rental income from the Par Street Property.

Bargo also was involved with the purchase of the Pointview Property.[7]  Bargo signed a contract to purchase the home for $245,000 on May 20, 2004. (Plaintiff's Ex. No. 31).  Bargo paid the initial deposits of $1,000 and $7,350 required to purchase the home.  The deposit checks were written on Bargo's account at Wachovia Bank. (Plaintiff's Ex. No. 10, Check No. 096; Plaintiff's Ex. No. 32, Check No. 091).

The sale had not closed, however, when Bar-Am was scheduled to return to Israel on July 21, 2004.  Therefore, on July 19, Bar-Am signed both a Specific Power of Attorney, giving the debtor the power to encumber, convey or otherwise handle the Pointview Property (Plaintiff's Ex. No. 35), and a Durable Power of Attorney, giving the debtor even broader powers to act in connection with the Pointview Property. (Plaintiff's Ex. No. 36).  In addition, the contract to purchase the Pointview Property was amended to provide that the purchaser would be Bar-Am and that he would "be getting financing instead of paying cash." (Defendant's Ex. No. 10).  The parties apparently believed at that point that Bar-Am would take title to the home.

However, once Bar-Am had left the United States, the debtor went in a different direction on the purchase of the Pointview Property.  On August 10, 2004, Build-In, not Bar-Am or Bargo, took title to the home.   (Plaintiff's Ex. No. 38).  The monies to purchase the home, $246,000, however, came from Bargo's operating account at Wachovia Bank. (Plaintiff's Ex. No. 10, Page No. B0168).  A few days later, Build-In transferred title to the Pointview Property to the debtor's son, Shachar Grosman, by quit-claim deed.  (Plaintiff's Ex. No. 39).

---

[7] Bargo had signed other contracts to purchase homes in the Orlando area and had made minimal contractual deposits.  None of these purchases closed, so Bargo only paid for two homes—the Par Street Property and the Pointview Property.

Shachar paid nothing for the house.  He did, however, soon thereafter encumber the property with a large mortgage, in the amount of $183,750, obtained from Option One Mortgage Corporation on October 22, 2004.  (Plaintiff's Ex. No. 40; Defendant's Ex. No. 17).  On October 28, 2004, Shachar received net proceeds from this mortgage in the amount of $172,430.25.  (Plaintiff's Ex. No. 41).  From these proceeds, Shachar transferred $130,000 into Noga's Swiss bank account on November 1, 2004.  In addition, Shachar testified that he used some of the remaining $42,000 to pay his outstanding debts and gave the balance to Mickey Grosman.

On July 26, 2004, the debtor also withdrew the majority of the remaining funds deposited in Bargo's bank account, when he wrote a check for $50,000 from the Bargo account payable to Grosman Republic LLC, another Grosman family company created by the debtor.  (Plaintiff's Ex. No. 10, Page Nos. B0165, B0163).  The debtor also later took other smaller amounts from the Bargo account.[8]

Therefore, the agreed facts show that Bar-Am and the debtor decided to act as business partners.  They formed separate companies, Nourit and Build-In, which, in turn, were equal co-owners of Bargo.  The business purpose of the enterprise was to buy homes to renovate and to sell.  Both Nourit and Build-In contributed substantial sums to the enterprise, with Build-In contributing $165,000 and Nourit contributing $225,000.[9]

Bargo, in fact, did pursue the purchase of distressed houses, signing several purchase contracts.  Bargo actually paid to buy two homes—the Par Street Property for $154,000 and the Pointview Property for $246,000.  However, shortly after Bar-Am returned to Israel for the second time, the debtor stripped Bargo of all of its assets.  Title to the two homes was transferred

---

[8]  The debtor wrote a check to himself from the Bargo account in the amount of $803 on August 23, 2004.  (Plaintiff's Ex. No. 10, Page No. B0154).  The debtor wrote a check in the amount of $570 to Grosman Republic LLC from the Bargo account on or about August 25, 2004. (Plaintiff's Ex. No. 10, Page No. B0155).

[9]  In addition, Bargo received the mortgage proceeds of approximately $98,000, when Bar-Am got a mortgage loan encumbering the Par Street Property.  Therefore, Bargo received total funds of at least $488,000.

to Build-In, and, in the case of Pointview, later transferred to the debtor's son for no consideration. Any cash remaining in Bargo's operating account was transferred by the debtor to Grosman family companies.

Bar-Am contends that these transfers were unjustified, constitute a defalcation of the debtor's fiduciary duty as the managing member of Bargo, and further were an improper conversion of Bargo's assets, making any debt due by the debtor to Bargo, Nourit, or Bar-Am non-dischargeable under Sections 523 (a)(4) and (6) of the Bankruptcy Code. The debtor loudly denies these accusations contending that Bar-Am never invested any monies into Bargo, that all funds originally came from the debtor, and that, when the debtor stripped assets from Bargo, it was to repay the loan extended by the debtor to Bar-Am and with Bar-Am's consent. The parties hotly contest whether this loan ever occurred.

### Disputed Events

The primary dispute is whether the debtor, consistent with his affirmative defense, actually made a cash loan of $200,000 to Bar-Am on March 23, 2004. The alleged purpose of the loan was to give Bar-Am a liquid source of cash to demonstrate his ability to immigrate to the federal authorities. The funds supposedly came from monies the debtor had secreted at his home, either in a safe or in a freezer. Some of the money came from amounts skimmed off the top of the bakery earnings; other funds came from an alleged inheritance of $15,000 to $20,000. Shachar Grosman testified that he made weekly payments in cash to his parents from his earnings, totaling about $80,000. In any event, the debtor, Noga Grosman, and Shachar Grosman all testified that they kept large sums of cash in the house. The debtor estimated the cash totaled $230,000.

The debtor presented absolutely no credible evidence that any such large sum of money ever existed. He had no accounting. He had no substantiation for the inheritance portion.

Shachar could not provide any information on the amount he contributed to the alleged pot.  He just said he trusted his father to take care of his money.

Moreover, at the time the alleged loan was made, the debtor owed at least $75,000 to creditors, who all eventually obtained judgments or claims against him.  All of these debts arose in connection with the operation of the bakery or its sale.  For example, Niagara Distributors, Inc. obtained a Final Summary Judgment of $56,347.80 against the debtor individually (and others) on May 3, 2004.  (Plaintiff's Ex. No. 47).  This litigation had been filed sometime in 2002.   Similarly, Roma Food Enterprises of Florida, Inc. obtained an amended Final Judgment against the debtor individually (and again others) in the amount of $10,316.17 on August 24, 2004.  (Plaintiff Ex. No. 48).    Further, it appears that the debtor's lawyers were suing him for unpaid fees at the time he filed this Chapter 7 bankruptcy on September 12, 2005.  (Plaintiff's Ex. No. 49).  As such, although the debtor and his family received at least $450,000 in net proceeds from the sale of the bakery business and he claims they had $230,000 in cash sitting in the freezer, the debtor was not using these funds to pay his debts.

Moreover, the debtor could not explain why he would keep such large amounts of cash in unprotected locations without earning interest.  The debtor could not explain why, in February 2004, he and Noga opened the Swiss bank account, specifically to earn a favorable interest rate, when he says he had an equal amount of money just sitting around the house earning no interest.

The debtor's only explanation for the loan was that his family had a tradition to keep large amounts of cash readily available.  Noga said the funds were kept for a "rainy day."  However, discounting the fact that no documentation exists for this large amount of cash, if the family worked to save this much money for an unpredictable disaster, why would the debtor simply give his entire secreted nest egg to Bar-Am, an acquaintance he had not seen for over ten years?  The rationale seemed contrived.

The circumstances surrounding the alleged transfer of the cash also beg credibility.  The debtor testified that Bar-Am allegedly went to a local department store and purchased a sheet in order to make a pouch he could wrap around the money and attach to his body when he flew home to Israel.  Although no precise evidence was presented on the bulk or weight a bundle of money totaling $200,000 would equal, it is difficult to believe that the debtor would assist Bar-Am in strapping the money to his body and simply flying away, particularly during today's enhanced security searches that occur when traveling internationally.  The transport of $200,000 in cash would violate numerous customs and criminal laws, certainly in the United States, and perhaps in Israel.  Discovery of the monies would in all likelihood result in its confiscation.  The Court has difficulty believing that the debtor would bear this risk.

The debtor contends that four documents confirm his loan to Bar-Am:  (1) a copy of a promissory note,  (2) a fax to Donato Ripa, the Credit Suisse agent, dated April 27, 2004, which may or may not have been sent or seen by the parties, referencing the loan, (3) a disputed addendum to a later joint venture agreement, and (4) a letter from the debtor, dated July 26, 2004, supposedly sent to Bar-am after he returned to Israel.  None of these documents establish that, more probable than not, the debtor loaned $200,000 to Bar-Am.

As to the promissory note, the debtor has only a photocopy of an alleged note dated March 23, 2004.[10]  (Defendant's Ex. No. 1).  He claims he returned the original to Bar-Am on July 21, when he was leaving the United States. The note contains what appears to be Bar-Am's Israeli's identification number.  However, the number is exactly the opposite of the correct number and is similar to the transposed identification number included in Bar-Am's immigration paperwork.  Grosman had a copy of this paperwork with the mistaken information.  (Compare,

---

[10] A copy of the alleged promissory note was not produced until September 28, 2006, shortly before the trial in this adversary proceeding was scheduled to start and years after the litigation between the parties started.  (Plaintiff's Ex. No. 68).

Plaintiff's Ex. No. 87).  Moreover, in an affidavit signed by the debtor in October 2005, the debtor did not mention the existence of any such note in asserting that Bar-Am borrowed the money in 2004.  (Plaintiff's Ex. No. 66).

The second document allegedly confirming the cash loan was a fax, dated April 27, 2004, which the debtor allegedly sent to Donato Ripa at Credit Suisse.  (Defendant's Ex. No. 6).   In order to understand the nature of this fax, a little background is needed.  Just a few days earlier, on April 22, 2004, Bar-Am had opened an account at Credit Suisse, also with Mr. Ripa's help. He had traveled to Zurich carrying $270,000 in cash in a brief case.  Bar-Am went directly to a Credit Suisse Bank office, met Mr. Ripa (as was prearranged), and opened a new account, depositing $269,198.  Without question, Bar-Am deposited approximately $270,000 into this new account on April 22, 2004, at the same bank where the Grosmans kept their funds. (Plaintiff's Ex. No. 11).  Bar-Am then continued on his journey to the United States, arriving on April 24, 2004.

Two days later, on April 26, 2004, Bar-Am sent a fax to Mr. Ripa at Credit Suisse instructing him to make two transfers:  (1) transfer $250,000 to Nourit's account, and (2) transfer $200,000 to Build-In's account. (Plaintiff's Ex. No. 3). The $250,000 amount was attributable to funds of $270,000 Bar-Am had deposited just days earlier in his new Swiss bank account.  The source of the other $200,000 deserves a further explanation.

Apparently, Mickey Grosman, perhaps without his wife's knowledge, had transferred $200,000 from Noga's Swiss account to Bar-Am's Swiss account.  No credible explanation was given for this transfer.  Although Bar-Am professed "shock" at this transfer, the Court finds that Bar-Am knew of the debtor's actions and facilitated the transfer of the $200,000 from Noga's account to his account, for whatever reason.  As such, by the morning of April 27, Bar-Am's

account held his original $270,000 as well as the additional $200,000 transferred by the debtor from Noga's Swiss account.

In any event, Mr. Ripa promptly complied with Bar-Am's request to further transfer the funds to the accounts of Nourit and Build-In. (Plaintiff's Ex. No. 4). Nourit received the $250,000 wire transfer at 10:21 a.m. on April 27, 2004. (Plaintiff's Ex. No. 5). Build-In also received a $200,000 transfer at approximately the same time. The $200,000 transferred to Build-In originated from Noga's Swiss account and only momentarily was deposited in Bar-Am's Swiss account. This transfer has nothing to do with the alleged cash loan from the debtor to Bar-Am.

The parties agree two faxes associated with these transfers were sent to Mr. Ripa. The parties agree that the debtor directed Mr. Ripa to transfer $200,000 from Noga's Swiss Account to Bar-Am's Swiss Account (Defendant's Ex. No. 4), and that Bar-Am directed a further transfer of funds from his Swiss account to Nourit and Build-in. (Defendant's Ex. No. 5).

The parties dispute whether a third fax, referencing the alleged loan to Bar-Am, was actually sent to Mr. Ripa at Credit Suisse. (Defendant's Ex. No. 6). The disputed fax is seven pages in length, is from the debtor, and references the loan of $200,000 that "Bar-Am deposited in Credit Swiss [sic] Bank in cash is money that I have lent Mr. Bar-Am and that came from my family life saving [sic]." (Defendant's Ex. No. 6). The fax also enclosed corporate information about Nourit and Build-In, the designated recipients of the funds.

All faxes, whether two or three, necessarily were sent from the debtor's home. The debtor's phone records were introduced during the trial. (Defendant's Ex. No. 5). The phone records indicate only two faxes were sent to Mr. Ripa at either 10:07 p.m. on April 26 or at 9:05 a.m. on April 27. In addition, two telephone calls (not faxes) were made to Mr. Ripa's telephone number at 8:31 a.m. and 10:49 a.m. on April 27, 2004.

Although transmitted faxes typically contain some heading indicating the exact date and time a fax is sent, here, neither party supplied a copy of any of the faxes with a notation as to the date and exact time the faxes were sent to Mr. Ripa.  As such, the Court cannot discount the possibility that the disputed fax was later manufactured to help buttress the debtor's current version of the events, given it has no transmission header.

It certainly is possible that both short faxes were sent in the same transmission on the evening of April 26; however, it is equally probable that Bar-Am's fax directing the transfer of the funds to Nourit/Build-In was not sent until 9:05 a.m. on April 27.[11]  If so, there was absolutely no indication the fax referencing the cash loan was ever sent to Mr. Ripa.  The debtor simply has failed to prove that he actually sent the fax referencing the cash loan.

More importantly, even if he did send the fax, there is no indication that Bar-Am or for that matter, Mr. Ripa, ever saw a copy.  The only importance of this hotly disputed fax is that it references the cash loan early in the parties' business relationship.  However, nothing ties the fax, even if it was sent, to the plaintiff.

The third document supporting the debtor's position that a cash loan was made is an addendum to a document, titled a "joint venture agreement."  The agreement and a blank version of the addendum were drafted by a real estate lawyer neither the debtor nor Bar-Am had met previously, Scott Price.  Mr. Price received no information about the parties' existing business deal.  He had no knowledge of the existence of Bargo, Nourit, or Build-In.  He never saw the Bargo operating agreement.

---

[11] The debtor notes that, because Switzerland is six hours ahead of the United States, a fax received at 9:05 a.m. Eastern Standard Time would be received in Switzerland at 3:05 p.m. in Zurich.  However, the funds were transferred to the Nourit/Build-In accounts about 1.5 hours after the fax, at 10:21 Eastern Standard Time.  Therefore, the transfers could have occurred as a result of either Bar-Am's acknowledged fax directing the transfer or as a result of the debtor's disputed fax.  The timing does not resolve any ambiguities.

Rather, the debtor, in a telephone call made on or around July 20, asked Mr. Price to quickly draft a 'form' version of a generic joint venture agreement. Based on this information, Price prepared a draft agreement (Defendant's Ex. No. 10), faxed it to the debtor, and then met with both the debtor and Bar-Am briefly in his office to make suggested changes to the agreement. Mr. Price handed the parties the final version of the agreement in his office on July 20, 2004. (Defendant's Ex. No. 13). He charged a total amount of $400 for his services, spending two hours on the project.

The purpose of the joint venture agreement is ambiguous. The agreement is between Bar-Am, his business partner in Israel, Afaf Yeheia, and Shachar Grosman. Significantly, the owners of Bargo—Nourit and Build-In—are *not* parties to the agreement. Nor is Mickey Grosman a party to the agreement. The agreement, however, does reference the Par Street Property and the Pointview Property as well as other purchases the Bargo investors considered but did not complete. Under the agreement, Bar-Am was to take title to these properties. The parties contemplated that additional properties would be added in the future, and the agreement, as drafted by Mr. Price, contained an incomplete addendum that would allow the parties to add properties as they were later purchased. Beyond that simple language, the agreement contained little more than boilerplate.

The joint venture agreement could not replace the Bargo operating agreement, insofar as the parties are dissimilar. Moreover, none of the parties at any point ever took *any* action to effectuate any portion of the agreement. Why the parties hired a new attorney and took the effort to quickly craft this agreement that they never followed literally on the eve of Bar-Am's return to Israel is a mystery.

However, the debtor now relies on the hotly contested handwritten addendum to this embryonic agreement to establish his earlier cash loan. (Plaintiff's Ex. Nos. 72 and 73). The

troubling language written in Hebrew in the addendum requires Bar-Am "to immediately pay off his debt to the Grosman family, in the sum of $200,000 (Two hundred thousands [sic] dollars) that he received in cash, as a loan in the month of March 2004 from Mickey Grosman in the USA." (Defendant's Ex. No. 13). The second paragraph of the addendum required Bar-Am "to invest his part in the Joint Venture, in the sum of $250,000 (Two hundred fifty thousands [sic] dollars) within 60 days from today." Of course, only Shachar, not the debtor, was even a party to the joint venture agreement.

Although the testimony of the parties was conflicting, the Court would find that the joint venture agreement in the form drafted by attorney Price was signed by Shachar Grosman and Bar-Am on the morning of July 21 as Bar-Am was preparing to drive to Miami to catch a plane. Mickey Grosman witnessed the signature. Yeheia never signed the agreement and, apparently, was never asked to sign the agreement.

Bar-Am acknowledges that he did sign the joint venture agreement in the form drafted by Price. He further admits that he signed multiple copies[12] and may have signed a blank version/s of the contested addendum. However, Bar-Am completely denies ever signing any form of the addendum with the handwritten language included. Bar-Am contends he did not see the handwritten addendum until this litigation commenced.

The Court acknowledges that Bar-Am's testimony regarding his execution of the addendum has shifted. Initially, Bar-Am vehemently denied that he ever signed the addendum or any version of the joint venture agreement containing the debtor's signature as a witness. (Defendant's Ex. No 19, Bar-Am's Answer to Interrogatory No. 4; Defendant's Ex. No 83, page 35, line 20. ) (Bar-Am's attorney represented to a state court judge that the Addendum "is a forgery, this handwritten document, that Mr. Bar-Am never signed it."). Later, at trial, when

---

[12] The debtor also acknowledges that multiple copies of the agreement were signed.

presented with an original addendum containing an original signature, Bar-Am stated that the signature on the addendum looked like his, but that he never saw the included text, if indeed he signed the document at all.  In any event, after weighing the conflicting testimony, the Court finds that Bar-Am did sign the joint venture agreement in the form prepared by Price, including a blank version of the addendum.  The remainder of the language, including the language referring to the cash loan, was added at a later time, after Bar-Am had left the United States.

Immediately after signing the joint venture agreement, the debtor drove Bar-Am to Miami to catch his plane home to Israel, leaving at 6:55 p.m. on the evening of July 21, 2004. The toll records indicated that the parties left Orlando at approximately noon and arrived in the Miami area around 2:40 p.m. on July 21, 2004.  (Defendant's Ex. No. 14).  At trial, the debtor unconvincingly testified that, during the drive, he and Bar-Am struck yet a new business agreement, separate and apart from the original agreement involving Bargo or even the joint venture agreement signed earlier that day.  Bar-Am disputes this new agreement was reached or even discussed.

The debtor contends he mailed a written summary of this new agreement to Bar-Am in a federal express package that arrived in Israel on August 2, 2004.  (Defendant's Ex. No. 15). It is this letter that is the fourth contested piece of evidence establishing the debtor's earlier cash loan. Bar-Am acknowledges that he received the federal express package from the debtor containing various quit claim deeds and powers of attorney.   (Plaintiff's Ex. No. 74). However, he vehemently denied that the package contained a letter reflecting any new business agreement.

The debtor, during trial, continued to assert, however, the parties reached yet another new deal on the way to the airport on the afternoon of July 21.  As explained in the disputed letter, the new deal required Bar-Am to consent to the debtor to pocketing all of the Bargo funds as well as transferring title to the Par Street Property to Build-In, in exchange for a forgiveness and

payment of the cash loan.    As to the Pointview Property, Bar-Am agreed to relinquish any interest in the property and to agree that Shachar should take title to the home in his name. Although the debtor clearly took the actions listed in this letter, the Court would find that Bar-Am never consented to the transfers.  The letter was crafted by the debtor after he had effectively stripped Bargo of its assets in an attempt to explain his actions.  Bar-Am never agreed to the deal, and, prior to this litigation, had never seen this self-serving letter drafted by the debtor. Certainly, nothing indicates that Bar-Am agreed to the deal, other than the debtor's testimony.

In addition, the parties' independent actions belie that any new deal was reached between them on the way to the Miami airport.  One of the terms of the "new" deal required the debtor to pay $30,000 to Bar-Am.  The debtor did, in fact, transfer this $30,000 to Bar-Am's Swiss bank account, but the transfer occurred on the *morning* of July 21, 2004, prior to the time the debtor allegedly discussed this new deal with Bar-Am.  No credible explanation was offered why the new deal required this extra $30,000 payment.

However, the undisputed facts demonstrate that the debtor *already* had transferred $30,000 to Bar-Am's Swiss bank account on the morning of July 21, 2004, before the joint venture agreement was signed.  The transfer was documented by Credit Suisse as occurring on July 21, which, given the time difference, necessarily occurred before noon Eastern Standard Time.  (Defendant's Ex. No. 11).  As such, the debtor had transferred $30,000 to Bar-Am before leaving for Miami or having any alleged discussions about a "new" deal.  More importantly, why would the debtor send Bar-Am $30,000, if Bar-Am, at that very moment, owed the debtor $200,000?

In examining the four documents submitted by the debtor to confirm the cash loan made in March 2004, the Court finds none of the documents credibly prove the loan was made.  The promissory note is a photocopy and contains an incorrect Israeli identification number for Bar-

Am, suspiciously similar to a mistaken identification number listed on a legal document in the debtor's possession.  The disputed April 27 fax to Mr. Ripa fails to include any transmittal data and nothing in the evidence demonstrates conclusively that the fax was sent or seen by either Bar-Am or Mr. Ripa.  The addendum to the July 2004 joint venture agreement similarly is suspect, and the Court concludes the debtor completed the portion referencing the cash loan sometime after Bar-Am had returned to Israel.  Lastly, the "new" deal summarized in a letter written by Grosman and allegedly sent to Bar-Am is inconsistent with the undisputed facts (the transfer of the $30,000 by Grosman to Bar-Am on the morning of July 21) and is hard to comprehend, other than to conclude that the debtor "wrote" the letter after the fact to belatedly explain his actions and manufacture Bar-Am's consent.

The Court also does not find the testimony of the debtor's family on the subject of the cash loan credible.  Both Noga, the debtor's wife, and his son, Shachar, directly benefited from the debtor's actions.  Noga received cash of $130,000 infused into her Swiss bank account.  Shachar received a home, the Pointview Property, with a purchase price of $245,000, for a mortgage amount of only approximately $170,000—not a bad deal.  Moreover, watching the demeanor of the witnesses during trial, Noga and Shachar clearly looked to the debtor to frame their responses.  The debtor controls all family decisions and directed the testimony of Noga and Shachar.

Grosman was simply not candid or forthcoming in his testimony or in the pleadings filed with the Court. For example, based on a review of Grosman's schedules and statements filed in this bankruptcy case, signed under penalty of perjury, the debtor has failed to disclose significant assets and transfers.  He listed no bank accounts, yet on January 26, 2004, he deposited $450,850, the proceeds of the bakery sale, into a bank account he maintained jointly with Noga at AmSouth Bank. (Defendant's Ex. No. 2).  He failed to list these substantial proceeds as

income received within two years of the bankruptcy filing in response to Question Number 2 of his Statement of Financial Affairs.  More telling, the debtor listed his ownership interest in Grosman Management, LLC and Grosman Republic, LLC but failed to list his interest in Build-In, LLC, in which he is the 100 percent owner and managing member.  Build-In has substantial assets insofar as it still owns the Par Street Property and previously owned the Pointview Property, prior to its transfer to the debtor's son for no consideration.  The debtor also failed to list the proceeds of as much as $170,000 he received from Shachar when he mortgaged the Pointview Property in October, 2004, less than one year preceding the bankruptcy.  The debtor apparently is very complete in listing his debts, but woefully incomplete in listing his assets, income, and transfers received within two years of the bankruptcy filing.

The Court reluctantly concludes that the debtor and his family did not testify honestly and that they manufactured evidence.  Moreover, the Court concluded that the debtor did not make a cash loan of $200,000 to Bar-Am.  Grosman carries the burden of establishing this affirmative defense.  F.T.C. v. National Business Consultants, Inc., 376 F.3d 317 (5th Cir. 2004) ("An affirmative defense places the burden of proof on the party pleading it.").  He has failed to carry this burden.  Further, the debtor did not contribute any portion of the $225,000 Bar-Am/Nourit invested into Bargo.  The debtor has failed to credibly explain why he was entitled to strip Bargo of its assets and monies as alleged in his affirmative defense.  But the undisputed fact remains that the debtor *did* secret all of Bargo's assets for himself, his family, and his closely held corporations.

Ultimately, the Court's ruling rests upon a credibility determination after weighing the evidence and the parties' testimony.  Given that the parties' stories differed so dramatically, the Court acknowledges the possibility that the debtor, indeed, *may* have made a cash loan to Bar-Am. Nevertheless, the debtor has failed to establish any credible evidence of such a loan.  One

who chooses to deal in cash transactions and disregards the formality of documenting such transactions bears the risk of not being able to later establish that such a loan was made.  The debtor has failed to carry his burden of proof supporting his affirmative defense that a $200,000 cash loan was made to Bar-Am.

### 523(a)(4)

Eventually, Bar-Am realized that his business relationship with the debtor had ended, badly.  Bar-Am returned to the United States in October 2004.  He discovered the transfers to Build-In in July/August and discovered the extent of the business catastrophe.  Bar-Am had lost all monies invested in Bargo, had no assets to show for his investment, and was personally liable on the mortgage encumbering the Par Street Property.  At the same time, the debtor had transferred all cash in Bargo's account for his own use, still held title to the Par Street Property, had transferred title to the Pointview Property to his son, for no consideration, and then received as much as $170,000 from Shachar when he placed a mortgage on the property.

Bar-Am next filed suit against the debtor in the Florida state courts.[13]  As a defense to that suit, the debtor filed a counterclaim contending that the debtor had lent Bar-Am $400,000 (not the now claimed $200,000) in March, 2004.  (Plaintiff's Ex. No. 57).  The debtor also asserted numerous other counterclaims against Bar-Am, including defamation and intentional infliction of emotional distress.  The debtor never amended this counterclaim, but, instead, filed this Chapter 7 bankruptcy case on September 12, 2005.

Bar-Am has consistently pursued his claims against the debtor, the Grosman family, and their companies since learning of his loss.  He has incurred legal fees exceeding $150,000.  He

---

[13] The lawsuit was styled:  <u>Abraham Bar-Am v. Mickey Grosman</u>, et. al., Case No. 04-CA-8942, filed in the Circuit Court of the Ninth Judicial Circuit in Orange County, Florida.

now seeks a judgment holding that any debt ascertained in the state court litigation against the debtor will not be discharged in the debtor's bankruptcy case.

The bankruptcy system is designed to provide a "fresh start" for honest but unfortunate debtors by discharging their debts. Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). With this policy in mind, the exceptions to discharge delineated in Section 523 of the Bankruptcy Code are construed narrowly against a creditor and liberally in favor of the debtor. Hence, the creditor has the burden to prove by a preponderance of the evidence that a particular obligation of the debtor falls within one of the exceptions to discharge in Section 523. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The exceptions that Bar-Am asserts here are Bankruptcy Code Sections 523(a)(4) and (6).

Bankruptcy Code Section 523(a)(4) provides that a debtor is not discharged from debts resulting from "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Here, Bar-Am's complaint does not allege embezzlement or larceny, but, rather, that Grosman committed fraud/defalcation in his capacity as a fiduciary in regards to Bar-Am, Bargo, and Nourit. To establish his claim, Bar-am must prove: (1) Grosman was acting in a fiduciary capacity; and (2) while acting in a fiduciary capacity, Grosman committed fraud or defalcation. In re Magpusao, 265 B.R. 492, 497 (Bankr.M.D.Fla.2001). The threshold question is whether or not Grosman had a fiduciary duty to the plaintiffs by virtue of his business relationship with Bar-Am and by his role as managing member of Bargo.

In the bankruptcy context, a fiduciary capacity is narrowly defined. In re Miceli, 237 B.R. 510 (Bankr. M.D. Fla. 1999) (citing Quaif v. Johnson, 4 F.3d 950, 952 (11th Cir. 1993). "[T]he broad definition of a fiduciary relationship, one involving confidence, trust, and good faith, is insufficient to prove a cause of action pursuant to § 523(a)(4)." In re Cramer 93 B.R. 764,

767 (Bankr.M.D.Fla.1988) (citing Angelle v. Reed (In re Angelle), 610 F.2d 1335 (5th Cir.1980)). While the existence of a fiduciary relationship under Section 523(a)(4) is determined by federal law, state law is relevant to the inquiry. See, e.g., Brothers v. Young (In re Young), 91 F.3d 1367, 1371-72 (10th Cir.1996); In re Cramer, 93 B.R. 764, 767 (Bankr.M.D.Fla.1988) ("Although the definition of "fiduciary" under § 523(a)(4) is a matter of federal law, the court must consult applicable state law in determining whether the type of trust relationship contemplated by § 523(a)(4) exists.") (citing Ragsdale v. Haller, 780 F.2d 794 (9th Cir.1986)).

Here, Florida law is relevant.  In Florida, joint ventures are considered to be a form of partnership and generally are governed by the same law. Williams v. Obstfeld, 314 F.3d 1270, 1275-1276 (11th Cir. 2002) (citing Kislak v. Kreedian, 95 So.2d 510, 514 (Fla.1957); see also Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein, 872 F.2d 1536, 1539 n. 3 (11th Cir.1989). A partnership is created where "'both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.'" Williams, 314 F.3d at 1275 (citing Dreyfuss v. Dreyfuss, 701 So.2d 437, 439 (Fla.Dist.Ct.App.1997)). A joint venture also requires that the parties have a mutuality of interest in profits and losses, but further requires an express or implied contract consisting of a common purpose, a joint proprietary interest in the subject matter, and joint control or a joint right of control. See Williams, 314 F.3d at 1275-1276 (listing elements of joint venture) (citing Pinnacle Port, 872 F.2d at 1539; Kislak, 95 So.2d at 515).

Here, the business relationship between Bar-Am and Grosman, or their closely held corporations, Nourit and Build-In, is either a partnership or a joint venture under Florida law. Bar-Am and Grosman specifically formed Nourit, Build-In, and Bargo in order to invest in real estate and entered into the Bargo operating agreement to effectuate that goal.  Thus, there is an express contract consisting of a common purpose. Bargo did, in fact, enter into multiple contracts

to purchase distressed homes and used its funds, contributed by Nourit and Build-In, to buy the Par Street Property and the Pointview Property. Both Bar-Am/Nourit and Grosman/Build-In had an equal 50 percent interest in Bargo and its assets, including these two homes. Further, the Bargo operating agreement provided that profits and losses would be shared equally by Bar-Am/Nourit and Grosman/Build-In. Therefore, in forming Bargo, the equal partners had a common business purpose, pursued that purpose to invest in two homes, and agreed to equally share profits and losses.

The only remaining element to establish a partnership/joint venture requires the parties to demonstrate that they share joint control (or the right to joint control) of the venture. In this case, the men explicitly agreed that Grosman would act as the managing member of Bargo, controlling Bargo's operations and monies, and that Nourit would not interfere in Grosman's management of Bargo. However, the requirement of joint control does not preclude the partners from designating one party as manager for the venture and vesting that person with control of the venture.[14] Given that Bar-Am was still in the early stages of the immigration process, was unfamiliar with the legal business environment in the United States,[15] and was not as proficient in the English language as Grosman, it made sense that Bar-Am/Nourit entrusted Grosman/Build-In with managerial control over Bargo.

---

[14] In In re Cuenant, this Court, citing Pinnacle Port Cmty. Ass'n, Inc., v. Orenstein, 872 F.2d 1536, 1539 (11th Cir. 1989), stated that "[j]oint control cannot be established when one party has exclusive control over the undertaking." 339 B.R. at 276. In Cuenant, however, there were no elements of a joint venture established other than that the parties entered into an agreement having a common purpose, which was titled as a "joint venture." Otherwise, the plaintiff failed to demonstrate any joint proprietary interest among the participants to the venture, failed to show a mutuality of interests in both profits and losses, and failed to establish joint control of the venture, where one party had exclusive control of the venture but no corresponding ability to bind the other venturers in dealings with third parties. The facts in Cuenant are thus distinguishable from those presented here.

[15] Grosman has been a party in multiple lawsuits in the United States and has hired a number of attorneys over the years. He is very familiar with this country's legal system. Grosman also is familiar with business protocols in the United States, and he routinely forms new business corporations, each apparently for a specific business purpose. Several of his family's businesses are mentioned in this Memorandum Opinion and include the Grosman Family Limited Partnership and the Grosman Family Limited Management Company. He certainly had the expertise to act as the managing member of Bargo.

Moreover, despite the wording of the Bargo operating agreement stating that "no Member who is not a Manager shall participate in or interfere in any manner whatsoever with the management of the Company or the sale, exchange, lease, mortgaging or financing of its assets" (Plaintiff's Exh. No. 18, p. 11, ¶6.5), the Court finds that Bar-Am did actively participate in the business. He was involved in the search for and purchase of properties by Bargo.  He obtained a mortgage on the Par Street Property and deposited the funds of approximately $100,000 into Bargo's bank account. Even in executing the powers of attorney as he was preparing to return to Israel, Bar-am was acting to facilitate Bargo's operations.  Therefore, the Court concludes that the parties did have a partnership or joint venture relationship.

As joint venturers and equal owners of Bargo, Bar-Am/Nourit and Grosman/Build-In owed each other certain fiduciary duties.  Reaves v. Hembree, 330 So.2d 747 (Fla. App. 1976) (joint venturers "owe each other the utmost good faith, fairness, and honesty. This is particularly true of the venturer who is entrusted with the control of the property of the venture.") (citing Donahue v. Davis, 68 So.2d 163 (Fla. 1953)). As Bargo's managing member, Grosman owed specific and limited duties to Bargo, Nourit, and Build-In. Florida Statute 608.4225 delineates the general standard of conduct for managing members of limited liability companies, as Bargo was here. A managing member of a limited liability company owes to the limited liability company, and to all of the members of the limited liability company, fiduciary duties of loyalty and care. Fla. Stat. § 608.4225(1).  Under the express wording of the Florida statute, a managing member's duty of loyalty to the limited liability company includes accounting to the limited liability company and holding its property "as trustee."  Fla. Stat. § 608.4225(1)(a)(1).  Thus, the statute clearly defines certain limited fiduciary duties.

Nevertheless, the type of fiduciary duties specified for managing members of a limited liability company in Florida Statute 608.4225 does not create the extraordinary level of fiduciary

duty needed to make a debt non-dischargeable under Section 523(a)(4) of the Bankruptcy Code, when the duty is breached.  Rather, to preclude the discharge of a debt, Section 523(a)(4) imposes an additional requirement—the existence of an express or technical trust. In re Cuenant, 339 B.R. 262, 274 (Bankr.M.D.Fla.2006) (citing In re Miceli, 237 B.R. 510, 515 (Bankr.M.D.Fla.1999)); In re Hutchinson, 193 B.R. 61, 65 (Bankr. M.D. Fla. 1996). An express or technical trust exists when there is: (1) a segregated trust res; (2) an identifiable beneficiary; and (3) affirmative trust duties established by contract or by statute. Magpusao, 265 B.R. at 497. "A bankruptcy court will not find that a fiduciary relationship exists under 11 U.S.C. § 523 unless there is proof of an express or technical trust." In re Ducharme, 85 B.R. 640, 642 (Bankr.S.D.Fla.1988) (citing Damian Manufacturing Company v. Corwin, (In re Corwin) 76 B.R. 221 (Bankr.S.D.Fla.1987); McClain v. Elliott (In re Elliott), 66 B.R. 466, 467 (Bankr.S.D.Fla.1986)).

Although Florida Statute Section 608.4225 does supply certain fiduciary duties, for example, holding limited liability company property as trustee and refraining from intentional misconduct, the statute does not establish any type of express or technical trust, as required by Section 523(a)(4).  Nor does the Bargo operating agreement create an express or technical trust. Thus, although Florida law does make a managing member accountable to the limited liability company, it does not create a technical or express trust and does not, therefore, make a managing member a fiduciary for the purposes of Section 523(a)(4). As the Eleventh Circuit Court of Appeals has noted: "[t]he Supreme Court has consistently held that the term 'fiduciary' is not to be construed expansively, but instead is intended to refer to 'technical' trusts." Quaif v. Johnson, 4 F.3d 950, 953 (11th Cir. 1993) (citing Chapman v. Forsyth, 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844); Upshur v. Briscoe, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); Davis v. Aetna Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)).

Here, there simply was no segregated and/or defined trust res nor any trust beneficiary identified pursuant to Florida Statute Section 608.4225 or otherwise. Therefore, although Grosman certainly owed fiduciary duties to Bargo and Bar-Am/Nourit, the duties were limited and did not involve the administration of a technical/express trust or the control of a segregated res. As such, Bar-Am has failed to establish an essential element required by Section 523(a)(4) of the Bankruptcy Code.

### 523(a)(6)

Turning to Bar-Am's second argument for non-dischargeability, Section 523(a)(6) allows an exception to the dischargeability of a debt when the debtor willfully and maliciously injures another entity or the property of another entity. In re Howard, 261 B.R. 513, 520 (Bankr.M.D.Fla.2001). To prevail under Section 523(a)(6), Bar-Am must prove by a preponderance of the evidence that Grosman: 1) deliberately and intentionally; 2) injured Bar-Am or Bar-Am's property; by 3) a willful and malicious act. Id. "[A]n injury is willful when the debtor commits an intentional act for the purpose of causing injury or which is *substantially* certain to cause injury." Id. (*emphasis added*). See also, Hope v. Walker (In re Walker), 48 F.3d 1161, 1165 (11th Cir.1995). An act that is merely reckless is not a "willful act" for the purposes of Section 523(a)(6). Id. Meanwhile, an act is malicious if it is one which is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will." Id., citing Walker, 48 F.3d at 1163-64. Following the Walker decision, the United States Supreme Court clarified the term "willful" contained in Section 523(a)(6), stating that:

> The ... word "willful" modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional injury, not merely ... a deliberate or intentional act that leads to injury.... Moreover, § 523(a)(6)'s formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the consequences of an act," not simply "the act itself."

<u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 57-58, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998).

Bar-Am argues that Grosman willfully and maliciously converted the funds in Bargo to his own use, thus precluding dischargeability of any debt due to Bar-Am/Nourit under Section 523(a)(6). Florida law defines "conversion" as "an unauthorized act which deprives another of his property permanently or for an indefinite time." <u>Fogade v. ENB Revocable Trust</u>, 263 F.3d 1274, 1291 (11th Cir. 2001); <u>Border Collie Rescue, Inc. v. Ryan</u>, 418 F. Supp. 2d 1330 (M.D. Fla. 2006); <u>Shelby Mut. Ins. Co. of Shelby, Ohio, v. Crain Press, Inc.</u>, 481 So.2d 501, 503 (Fla. 2d. DCA 1985)). A plaintiff may demonstrate a claim for conversion if the plaintiff can prove: (1) an act of dominion wrongfully asserted, (2) over plaintiff's property, that is (3) inconsistent with plaintiff's ownership therein. <u>Compania de Elaborados de Cafe v. Cardinal Capital Management, Inc.</u>, 401 F. Supp. 2d 1270 (S.D. Fla. 2003).

The facts are undisputed that Grosman stripped Bargo of its assets—its monies, the Par Street Property, and the Pointview Property.  The assets were transferred initially to closely held corporations, Build-In or the Grosman Republic, LLC, owned and controlled by the debtor. Grosman attempts to justify the transfers by testifying he was just repaying himself for a $200,000 cash loan he had extended to Bar-Am.[16]  As held earlier, Grosman has utterly failed to prove he made a $200,000 cash loan to Bar-Am.  Grosman has failed to provide any credible explanation why he was entitled to transfer all of Bargo's assets to himself, his own corporations, and his family and distribute nothing to Bargo's co-equal member, Nourit.

As such, the Court holds that Grosman, acting through Build-In and Grosman Republic, LLC, wrongly asserted dominion over Bargo's assets to the detriment of Bar-Am and Nourit and

---

[16] The Court notes that the debtor's argument fails insofar as Nourit, LLC, <u>not</u> Bar-Am, was a member of Bargo. Grosman never lent any monies to Nourit and cannot explain how secreting Bargo's assets, owned 50 percent by Nourit, could repay a loan individually made to Bar-Am.

in a manner inconsistent with the plaintiff's ownership interest in the substantial assets.  Simply

stated, Grosman willfully and maliciously converted Bargo's assets to himself, his companies,

and his family.   Any debt due by Grosman to Bargo, directly, and to Nourit and Bar-Am,

indirectly, as to be determined later by the Florida state court, is not dischargeable under Section

523(a)(6) of the Bankruptcy Code.  A separate order consistent with this memorandum opinion

shall be entered simultaneously herewith.

DONE AND ORDERED in Orlando, Florida, on the 22nd day of May, 2007.

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor:  Mickey Grosman, 1820 Hempel Avenue, Windermere, FL  34786-8118

Plaintiff's Counsel:  Eric S. Golden, Baker & Hostetler, LLP, 200 S. Orange Avenue, Suite 2300, Orlando, FL  32801

Defendant's Counsel:  Michael J. Beaudine, Latham Shuker Barker Eden & Beaudine, LLP, P.O. Box 3353, Orlando, FL  32802